**STATE of North Dakota, Plaintiff and Appellee,**

**v.**

**Robert WINKLER, Defendant and Appellant.**

**Criminal Nos. 950370, 950371.**

Supreme Court of North Dakota.

July 18, 1996.

Alan J. Larivee of Pearson, Christensen, Larivee, Clapp, Fiedler & Fisher, Grand Forks, for defendant and appellant.

Laurie A. Fontaine, State's Attorney, Cavalier, for plaintiff and appellee.

NEUMANN, Justice.

Robert Winkler appeals from the judgment and conviction of negligent homicide, a class C felony in violation of N.D.C.C. § 12.1–16–03, and from the judgment and conviction of leaving the scene of an accident involving death or personal injuries, a class A misdemeanor in violation of N.D.C.C. § 39–08–04. Both convictions were entered on a conditional plea of guilty under Rule 11(a)(2), N.D.R.Crim.P., pending this court's review of the trial court's denial of motions to suppress evidence. We affirm the trial court's decision not to suppress Winkler's statements before and after his arrest, and the results of Winkler's Intoxilyzer test, but we remand for further consideration the trial court's decision not to suppress evidence seized from the search of Winkler's garage.

While walking along a highway west of Cavalier, North Dakota, on December 26, 1994, around 7:00 p.m., Gerald Carlson was hit by a vehicle. Carlson died from his injuries.

Responding to the accident call, Police Officer Kenneth Wolf began investigating the scene to determine what had happened to Carlson. He examined the immediate area for physical evidence, and found a broken headlight assembly and broken glass. Officer Wolf then went to the hospital where Carlson had been taken and talked with the attending doctor, who told him Carlson had died of massive trauma to the head, an injury consistent with being hit by a vehicle.

Officer Wolf relayed this information to the Chief of Police, Jim Johnson, who, along with Deputy Sheriff Calvin Cluchie, began investigating the local bars for information on persons who might have left those bars around the time of the accident. They were told Robert Winkler had been drinking and left one between 6:15 and 7:00 p.m. and another around 6:45 p.m. In the meantime, Officer Wolf and Keith Ogden, a highway patrol trooper, had further investigated the accident scene and determined a newer model pickup probably had been involved in the accident. Officer Cluchie knew Winkler drove a pickup.

After learning Winkler's whereabouts around the time of the accident, Cluchie, Johnson, and James Martindale, Pembina County Sheriff, drove to Winkler's home located a few miles west of Cavalier. They entered Winkler's property on the driveway, which extends over 200 feet from the public road to Winkler's home, and followed the driveway's right-hand turn behind the home where they noticed Winkler's pickup parked in the right-hand stall of the two-stall garage. The unattached garage is situated some 30 feet from the home.

Driving closer to the garage and illuminating the area with the headlights from the patrol car, the officers observed damage to the passenger front fender of Winkler's pickup. Exiting the patrol car, the officers confirmed the damage from their view outside the garage, and then entered the garage to further inspect the damage. The garage door was open.

The officers then applied for a search warrant, which the judge issued at 11:58 p.m. on December 26, 1994. In his affidavit supporting the warrant, Officer Cluchie did not inform the judge of the officers' entry into Winkler's garage.

At approximately 12:25 a.m., December 27, 1994, Officers Cluchie and Wolf knocked on the rear door of Winkler's home to serve the warrant on Winkler. Winkler answered the door, and Cluchie asked him to step outside the door. Because he was not properly

dressed, Winkler refused but invited the officers into his home. The officers, along with Martindale and Johnson, accepted, and began explaining to Winkler that they were executing a search warrant because they believed his pickup had been involved in a fatal hit-and-run accident. Winkler interrupted, stating "I knew I hit something, but I thought it was a deer." He continued, "It might have been a snowmobile, but I thought it was a deer."

Immediately upon hearing these statements, at 12:31 a.m., Officer Wolf arrested Winkler and informed him of his *Miranda* rights. Winkler continued to make similar statements, and additionally stated something to the effect of "What the hell was he doing walking down the middle of the road." After getting dressed, Winkler was placed in a patrol car at 12:40 a.m.

Because the officers noticed Winkler had a strong odor of alcohol, bloodshot eyes, and slurred speech, they also arrested him for driving under the influence. Winkler was taken to the police station, and given an Intoxilyzer test at 1:05 a.m., resulting in a blood-alcohol content of .152 percent.

After photographing Winkler's pickup in the garage, the officers seized the pickup. Trooper Ogden determined the vehicle parts from the accident scene came from Winkler's pickup.

Winkler was charged with leaving the scene of an accident involving death or personal injuries, negligent homicide, and driving under the influence. The DUI charge was later dismissed. After his motions to suppress evidence were denied, Winkler entered a conditional plea of guilty to the two remaining charges reserving his right, under Rule 11(a)(2), N.D.R.Crim.P., to appeal from the court's denial of his motions.

On appeal Winkler argues the trial court erred when it denied his motions to suppress: (1) the evidence seized from the search of his garage conducted under the warrant supported by Officer Cluchie's affidavit, (2) the statements he made before and after his arrest, and (3) the results of his Intoxilyzer test. We address each in turn.

## SUPPRESSION OF SEARCH WARRANT EVIDENCE

Winkler makes alternative arguments to invalidate the search warrant, and thereby require suppression of the evidence seized from the search of his garage. First, Winkler claims the warrant was not supported by probable cause because the information obtained by the officers was gathered through two unlawful searches: first, when the officers entered his property on his driveway and observed his pickup in his garage, and second, when they entered his garage to further inspect his pickup. Alternatively, Winkler argues the warrant is invalid because, in his affidavit, Officer Cluchie did not inform the judge issuing the warrant of the officers' prior unlawful entry into Winkler's garage. The State responds that the officers' action of entering Winkler's property and making observations while on his property were not unlawful because the actions did not constitute a "search," and further, if the entry into Winkler's garage was unlawful, the evidence inevitably would have been discovered.

The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, and Article 1, section 8 of the North Dakota Constitution, protect an individual from unreasonable searches and seizures. A search occurs when the government intrudes upon an individual's reasonable expectation of privacy. *State v. Blumler*, 458 N.W.2d 300, 301 (N.D.1990) (citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). When an individual possesses a reasonable expectation of privacy in a given area, the government must obtain a warrant before searching that area "subject only to a few specifically established and well-delineated exceptions." *Horton v. California*, 496 U.S. 128, 133 n. 4, 110 S.Ct. 2301, 2306 n. 4, 110 L.Ed.2d 112, 120–21 n. 4 (1990) (quoting *Katz*, 389 U.S. at 357, 88 S.Ct. at 514). A warrant cannot issue except upon probable cause. *E.g., State v. Runck*, 534 N.W.2d 829, 831–32 (N.D.1995). Absent an exception to the warrant requirement, the exclusionary rule mandates suppression of evidence obtained in violation of the protection against

searches conducted without a warrant because they are *per se* unreasonable. *Horton,* 496 U.S. at 133 n. 4, 110 S.Ct. at 2306 n.4 (emphasis added); *Blumler,* 458 N.W.2d at 302.

We do not agree with Winkler that the officers violated his reasonable expectation of privacy, and therefore conducted a warrantless search, when they entered his property on his driveway and observed his pickup in his garage. Like our neighboring courts, this court believes police with legitimate business may enter certain areas surrounding a home where persons may have a reasonable expectation of privacy, such as curtilage, but which are "impliedly open to use by the public." *State v. Crea,* 305 Minn. 342, 233 N.W.2d 736, 739 (1975); *State v. Krech,* 403 N.W.2d 634, 637 (Minn.1987) (stating police may "approach a dwelling in order to conduct an investigation if they restrict their movements to places visitors could be expected to go"); *State v. Lodermeier,* 481 N.W.2d 614, 624 (S.D.1992) (stating "[e]ven though [a driveway] is part of the curtilage, a police officer with legitimate business may enter a driveway and, while there, may inspect objects in plain view"); *see also Lubenow v. N.D. State Highway Comm'r,* 438 N.W.2d 528, 532 (N.D.1989) (stating appellant did not have "a reasonable expectation of privacy with regard to the officer observing from a place he had a right to be the contents and activities within the garage while the garage door was fully open"). Here, the officers were investigating a fatal hit-and-run accident with information possibly pointing to Winkler's involvement. Any member of the public would have entered upon Winkler's property in the manner the officers did. We, therefore, have no difficulty sustaining the officers' initial entry onto Winkler's driveway and observation of Winkler's pickup in the open garage.

We have more difficulty, however, with the officers' warrantless entry into Winkler's garage. Under these circumstances, Winkler had a reasonable expectation of privacy as to what could not be seen from outside his unattached garage, and the officers' entry into the garage constituted a search, thus requiring a warrant. *See Blumler,* 458 N.W.2d at 302 (involving attached garage). But even though the search was not lawful, we do not invalidate the warrant if it was supported by probable cause of an independent source. We will explain this conclusion in our analysis of Winkler's second argument.

Winkler next argues the search warrant is invalid because, in his affidavit, Officer Cluchie did not inform the judge issuing the warrant of the officers' prior unlawful entry into Winkler's garage. The United States Supreme Court in *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), addressed a similar argument under nearly identical facts.[1]

---

1. In cases involving omissions of information from search warrant affidavits, some courts apply an adaptation of the analysis developed by the United States Supreme Court in *Franks v. Delaware.* E.g., *United States v. Lucht,* 18 F.3d 541, 546 (8th Cir.1994); *see State v. Rydberg,* 519 N.W.2d 306, 308–09 (N.D.1994) (involving omission of information from a search warrant affidavit but not applying *Franks* analysis because the omission was not material information). In *Franks,* the Court held that when an officer knowingly or recklessly includes false information in an affidavit, the warrant is invalid unless the other information in the affidavit, considered alone, establishes probable cause. 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667, 667–68 (1978). The adapted version extends the *Franks* analysis to include "deliberate or recklessly omitted material information." *Lucht,* 18 F.3d at 546. The defendant must show "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, ... and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding a probable cause." *Id.*

The adapted *Franks* analysis generally has been applied in cases in which the omitted information arguably is exculpatory, and would preclude a finding of probable cause. We find it unhelpful in this case because supplementing Officer Cluchie's affidavit with the information about the officers' prior unlawful entry does not "cast doubt on the existence of probable cause." *See, e.g., United States v. Reivich,* 793 F.2d 957, 962 (8th Cir.1986) discussing limiting the extension of *Franks;* Wayne R. LaFave, Search & Seizure § 4.4(c), at 502 (3rd ed.1996) (arguing that a case should be treated as an omission situation "only as to omitted information tending to cast some doubt on the probable cause otherwise shown"). Instead, supplementing Officer Cluchie's affidavit bolsters the probable cause

In *Murray*, federal agents, after conducting surveillance, lawfully seized and searched a truck and camper both of which were found to contain marijuana. 487 U.S. at 535, 108 S.Ct. at 2532. After receiving this information, several agents unlawfully entered a warehouse from which those vehicles had exited earlier. *Id.* In the warehouse, the agents saw numerous burlap-wrapped bales. The agents "left *without disturbing* the bales, kept the warehouse under surveillance, and did not reenter it until they had a search warrant." *Id.* In the search warrant affidavit, the agents made no mention of the earlier warrantless entry or their observations of the bales. *Id.* Executing the search warrant several hours later, the agents seized the bales, which were found to contain marijuana. *Id.*

■ In assessing whether the evidence discovered during the second search could be admitted, the Court turned to the independent source doctrine. This doctrine "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377, 387 (1984); *State v. Ritter*, 472 N.W.2d 444, 450 (N.D.1991) (involving application of the independent source doctrine). It is based upon the rationale that " '[t]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.' " *Murray*, 487 U.S. at 537, 108 S.Ct. at 2533 (citing *Nix*, 467 U.S. at 443, 104 S.Ct. at 2509). Excluding evidence that the police ultimately obtained by independent legal means would not put the police in the same position they would have been in if they had not committed any

unlawful conduct; instead, it would put them in a worse position. *Id.*

■ "The ultimate question ... is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence." *Id.* at 542, 108 S.Ct. at 2536. Answering that question requires a two-part inquiry: (1) whether the warrant was supported by probable cause derived from sources independent of the unlawful entry, and (2) whether the decision to seek the warrant was prompted by what was seen during the unlawful entry.[2] *Id.; United States v. Hassan*, 83 F.3d 693, 697 (5th Cir.1996); *United States v. Johnson*, 994 F.2d 980, 987 (2nd Cir.1993); *United States v. Restrepo*, 966 F.2d 964, 971 (5th Cir.1992).

■ Turning to the first part of the inquiry, this court reviews a probable cause determination under the totality-of-the-circumstances approach. *State v. Rydberg*, 519 N.W.2d 306, 308 (N.D.1994). The question of probable cause is one of law. *Id.*

> "Probable cause to search does not require the same standard of proof necessary to establish guilt at trial; rather, probable cause to search exists if it is established that certain identifiable objects are probably connected with criminal activity and are probably to be found at the present time at an identifiable place."

*Id.* The task of the issuing judge is to make a practical, commonsense decision whether, given all the information considered together, there is a fair probability contraband or evidence of a crime will be found in a particular place. *Id.*

The trial court concluded "[t]here was sufficient testimony in this case for a magistrate to issue a search warrant of the defendant's vehicle." We agree. The judge issued the warrant authorizing the search of Winkler's

---

because, after observing damage to Winkler's pickup from outside the garage, the officers learned the nature of the damage to the pickup when they entered Winkler's garage. *Rydberg*, 519 N.W.2d at 308 (discussing the standard for reviewing the determination of probable cause).

**2.** *Murray* also indicated a "later, lawful seizure [could not be] genuinely independent of an earlier, tainted one" if the "information obtained

during [the tainted entry] was presented to the Magistrate and affected his decision to issue the warrant." *Id.* at 542, 108 S.Ct. at 2536. Because Officer Cluchie's affidavit did not reveal the officers' prior unlawful entry into Winkler's garage, obviously this omission was not presented to, and therefore, could not have affected the judge's decision to issue the warrant. *See United States v. Restrepo*, 966 F.2d 964, 969 (5th Cir. 1992).

property based solely upon information known to the officers before their unlawful entry into Winkler's garage. *E.g.*, *United States v. Curtis*, 931 F.2d 1011, 1014 (4th Cir.1991); *see also United States v. Register*, 931 F.2d 308, 311 (5th Cir.1991) (involving omission of information from search warrant affidavit). Officer Cluchie's affidavit indicated the officers knew Carlson probably had died from being hit by a vehicle. The vehicle probably was a newer model pickup. Winkler drove a newer model pickup. The officers also knew Winkler had left a local bar, after drinking, around the time of the accident, and had traveled home on the highway Carlson had been walking along when he was killed. After arriving at Winkler's home, the officers observed damage to the passenger front fender of Winkler's pickup parked at a slight angle in the opened, right-hand stall of Winkler's garage.[3] We conclude this information is sufficient to establish that Winkler's pickup probably was connected with the accident, and to support the issuing judge's practical, commonsense determination that a fair probability existed of finding this evidence in Winkler's garage.

▆▆▆▆ Though we conclude the search warrant was supported by probable cause derived from sources independent of the offi-

cers' unlawful entry into Winkler's garage, this conclusion does not resolve "[t]he ultimate question [of] whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence." *Murray*, 487 U.S. at 542, 108 S.Ct. at 2536. "*Murray* instructs that ... the warrant is nonetheless tainted if the illegally obtained facts prompted 'the [officers'] decision to seek the warrant.'" Wayne R. LaFave, Search & Seizure § 11.4(f), at 299 (3rd ed.1996); *Restrepo*, 966 F.2d at 971. "*Murray* assumes that the question is the actual motivation or intention of the officers in the particular case, that is, that a subjective rather than an objective test is applicable in this context." LaFave, § 11.4(f), at 300; *Restrepo*, 966 F.2d at 972. As in *Murray*, the trial court did not explicitly find that the officers would have sought a warrant if they had not earlier entered Winkler's garage.[4] Therefore, we remand to the trial court for a determination of whether the officers' decision to seek the warrant was caused by what they saw during the unlawful entry. *Murray*, 487 U.S. at 542 n. 3, 108 S.Ct. at 2536 n. 3.

We also note the consequences of this remand on Winkler's conditional plea of guilty. If the trial court finds the officers would have

---

3. The trial court's findings regarding the officers' observation of damage to Winkler's pickup from their view outside the garage include:

   "It is the finding of this court that the statements of Deputy Sheriff Cluchie were truthful when given for the purpose of acquiring a search warrant. In particular it is the finding of this court that when law enforcement drove into the defendant's yard near the opened garage, which is a part of the curtilage of the defendant's home, law enforcement officers were able to look into the garage and see the damaged panel on the passenger side of the defendant's vehicle. The Court is not satisfied that the driver of the police vehicle could see the damage from his vantage point. The Court does believe that the passenger in the front seat would have been able to see the damage. Upon exiting the vehicle they would have been able to see the damage to the defendant's vehicle from outside the garage using illumination from their vehicle's headlights. The defendant supplied photographs to the Court ... which shows that the vehicle was parked at a slight angle in the garage. This supports the contention of law enforcement that the dented side panel could be seen from outside the garage."

This court accords great deference to and recognizes the significance of the trial court's opportunity to assess the credibility of witnesses. *State v. Murray*, 510 N.W.2d 107, 110 (N.D.1994).

4. The State argued the evidence seized from the search of Winkler's garage was admissible under the inevitable discovery doctrine. The trial court made findings about the applicability of the inevitable discovery doctrine. But these findings do not amount to a determination of independent source. "While the inevitable discovery and independent source doctrines are closely related, they are not the same." *United States v. Markling*, 7 F.3d 1309, 1318 n. 1 (7th Cir.1993) (citations omitted).

   "The inevitable discovery doctrine applies where evidence is not actually discovered by lawful means, but inevitably would have been. Its focus is on what would have happened if the illegal search had not aborted the lawful method of discovery. The independent source doctrine, however, applies when the evidence actually has been discovered by lawful means. Its focus is on what actually happened—was the discovery tainted by the illegal search?" *Id.*

sought a warrant even if they had not entered Winkler's garage, Winkler's guilty plea stands. *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir.1993). If, however, the trial court finds the entry into Winkler's garage prompted the officers' decision to seek a warrant, the court must suppress the evidence seized from the search of Winkler's garage and allow Winkler to withdraw his guilty plea. *Id.* at 1317–18.

## SUPPRESSION OF PRE–ARREST AND POST–ARREST STATEMENTS

■ Winkler next argues his pre-arrest statements in which he admitted he had hit something should have been suppressed because he was not given his *Miranda* warnings. The State contends Winkler's statements were not made in response to questioning, but were volunteered by Winkler.

■ The fundamental requirement of *Miranda* is a warning to criminal defendants of their right to remain silent before making any statements to the State. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 720 (1966); *State v. Chihanski*, 540 N.W.2d 621, 623 (N.D.1995). Statements made by a defendant without benefit of this warning are inadmissible as evidence in a prosecution of that defendant. *Chihanski*, 540 N.W.2d at 623. But the warnings are required only when a defendant is in custody and is being interrogated. *Id.* Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *State v. Pitman*, 427 N.W.2d 337, 340 (N.D.1988).

Winkler claims he was subject to custodial interrogation for fifteen minutes from the time he invited the officers into his home at 12:25 a.m. until his arrest at 12:40 a.m. During the fifteen minutes, Winkler states, without benefit of *Miranda* warnings, the officers questioned him in his kitchen and followed him around, including into his bedroom while he got dressed. But Winkler's statement of events misrepresents and omits significant facts indicated in the record. The officers did enter Winkler's at 12:25 a.m., but, while explaining the reason why they were there, Winkler interrupted them with his statements about knowing he had hit something. Immediately after those statements, at 12:31 a.m., six minutes after arriving, Officer Wolf arrested Winkler and informed him of his *Miranda* rights. Winkler had already been arrested when the officers followed him into his bedroom. True, Winkler was arrested again at 12:40 a.m., but this was a second arrest, for DUI, made after Winkler had dressed and been placed in a patrol car. Thus, there was only a six-minute period in which Winkler had not been informed of his *Miranda* rights. We examine this six-minute period for custodial interrogation.

■ We acknowledge a reasonable person in Winkler's situation probably would not have felt free to leave the officers' presence, and therefore, at least for the purposes of our analysis, we may assume Winkler was in custody. *State v. Murray*, 510 N.W.2d 107, 110 (N.D.1994) (citing *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 336 (1984), in which the Court stated "the only relevant inquiry [on the question whether a suspect was 'in custody' at a particular time] is how a reasonable man in the suspect's position would have understood his situation."). But the element of interrogation is absent from Winkler's situation. The State contends Winkler volunteered the pre-arrest statements without interrogation. We agree. When the officers entered Winkler's home, they were not questioning Winkler, but were explaining their presence when Winkler interrupted them with his incriminating statements. *Rhode Island v. Innis*, 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 306–07 (1980) (defining interrogation). *Miranda* is not triggered by "volunteered statements of any kind." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630. There is sufficient competent evidence fairly capable of supporting the trial court's ruling that Winkler's "statements were not in response to police interrogation." *E.g., Murray*, 510 N.W.2d at 110 (noting the standard for reviewing trial court's disposition on a motion to suppress); *see, e.g., United States v. Makes Room*, 49

F.3d 410, 414 (8th Cir.1995) (indicating review of motion to suppress is under clearly erroneous standard). Thus, we affirm the trial court's denial of Winkler's motion to suppress his prearrest incriminating statements because Winkler was not subject to "custodial interrogation," and therefore, was not entitled to *Miranda* warnings.

█ Winkler also claims his post-arrest, *Mirandized* statements should have been suppressed because they were coerced and therefore involuntary. Winkler's post-arrest statements were similar to his pre-arrest statements, except that he also wondered out loud, "What the hell was he doing walking down the middle of the road."

█ "A confession is voluntary if it is the product of the defendant's free choice rather than the product of coercion." *Murray*, 510 N.W.2d at 111. Confessions are not voluntary when a defendant's will is overborne at the time the confession is given. *Id.* A court examines the circumstances surrounding the confession to determine voluntariness. *Id.* According to Winkler, coercive circumstances were present because he was awakened at an early morning hour by law enforcement officers who while executing a search warrant entered his home, held him in custody, and interrogated him while they followed him around his home. Absent Winkler's assertion of interrogation, which we already determined was not present, the remaining circumstances do not rise to the level of coercion. *But see, e.g., State v. Taillon*, 470 N.W.2d 226 (N.D.1991) (affirming suppression of coerced statements). The trial court implicitly ruled Winkler's post-arrest statements were not coerced and further ruled Winkler had been given "sufficient notice of his right to remain silent." There is sufficient competent evidence fairly capable of supporting that ruling. We, therefore, affirm the trial court.

## SUPPRESSION OF INTOXILYZER TEST

█ Winkler last argues the result of his Intoxilyzer test, a .152 percent blood-alcohol content, should have been suppressed. He contends admitting the result of a test obtained six hours after allegedly driving is irrelevant and prejudicial. Apparently, the State intended to use the result as evidence in its negligent homicide case against Winkler.

█ Because Winkler argued for suppression based on the evidentiary rules of relevance and prejudice, his motion "was essentially a pretrial motion in limine to preclude the State from introducing the results of the blood alcohol test into evidence." *State v. Simon*, 510 N.W.2d 635, 636 (N.D. 1994). The motion was not a Rule 12(b)(3) motion to suppress evidence "on the ground that it was illegally obtained." *Id.* Rule 12(b)(3), N.D.R.Crim.P. But counsel's mislabeling of the motion does not affect, for example, its appealability, because under the conditional plea rule, a criminal defendant has the right to appeal an "adverse determination of *any specified pretrial motion*." [5] Rule 11(a)(2), N.D.R.Crim.P. (emphasis added). A motion in limine is a pretrial motion. *Shark v. Thompson*, 373 N.W.2d 859, 864 (N.D.1985); McCormick on Evidence § 52, at 202 (4th ed.1992). However, we review a trial court's disposition of a motion in limine under a different standard than a motion to suppress. "A trial court has discretion to determine whether evidence is relevant, and its decision will not be reversed on appeal absent an abuse of discretion." *Williston Farm Equip., Inc. v. Steiger Tractor, Inc.*, 504 N.W.2d 545, 548–49 (N.D.1993).

█ Denying Winkler's motion, the trial court ruled Winkler's Intoxilyzer test was "relevant to [Winkler's] possible physical condition at the time" Carlson was killed. Similar to Winkler's argument, the defendant argued in *State v. Miller*, 530 N.W.2d 652

---

5. The State could not appeal from a pretrial evidentiary ruling. *State v. Miller*, 512 N.W.2d 469 (N.D.1994); *City of Fargo v. Cossette*, 512 N.W.2d 459 (N.D.1994); *State v. Simon*, 510 N.W.2d 635 (N.D.1994); *State v. Counts*, 472 N.W.2d 756 (N.D.1991); *State v. Miller*, 391

N.W.2d 151 (N.D.1986). The State's statutory right of appeal is narrow under section 29–28–07(5), N.D.C.C., limited to the granting of a motion to suppress illegally obtained evidence and to the granting of a motion to return evidence. *Miller*, 391 N.W.2d at 155.

(N.D.1995), the results of his blood test "administered approximately nine hours after the accident, [were] not relevant to the amount of alcohol in his blood at the time of the accident." *Id.* at 655. Disagreeing, this court determined the results "may be sufficient evidence for the trier of fact to convict a defendant" of the non-per se DUI offenses, and concluded the results of the test "were properly admitted into evidence." *Id.* Here, we extend the analysis, and conclude the results of an Intoxilyzer test may well be relevant evidence in a negligent homicide case. *See State v. Smaage,* 547 N.W.2d 916 (N.D.1996) (adhering to prior holding that it is not error for a trial court to give a jury instruction on DUI in a negligent homicide case); *see also Miller,* 530 N.W.2d at 655 (citing *Commonwealth v. Arizini,* 277 Pa.Super. 27, 419 A.2d 643, 650 (1980), in which the court stated "[s]o long as a blood test is indicative of a defendant's condition at a relevant time, it is admissible and subject to attack or contradiction by other competent evidence."). "[T]he results of an [I]ntoxilyzer test, regardless of when it was given, would be probative" evidence, *Pitman,* 427 N.W.2d at 342, but not necessarily conclusive evidence. *See Miller,* 530 N.W.2d at 655 (citing *Williams v. State,* 737 P.2d 360, 363 (Alaska.Ct.App.1987)). The trial court did not abuse its discretion when it denied Winkler's motion in limine to exclude the result of his Intoxilyzer test.

We affirm in part the trial court's order denying Winkler's motions, but reverse and remand in part for a determination of whether the officers would have sought the warrant to search Winkler's garage had they not seen the details of the damage to Winkler's pickup as a result of their pre-warrant unlawful entry.

VANDE WALLE, C.J., and MARING and MESCHKE, JJ., concur.

SANDSTROM, Justice, concurring and dissenting.

I agree with most of what the majority has written, except its analysis under *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). The majority reverses the District Court for failing to specifically rule on an issue never raised.

"It is a well-established principle in this state that issues not raised below cannot be raised on appeal. 'Generally, issues not raised in the trial court, *even constitutional issues,* will not be addressed on appeal.' *State v. Miller,* 388 N.W.2d 522 (N.D.1986) (emphasis added)."

*State v. Tweed,* 491 N.W.2d 412, 417 (N.D. 1992).

*Murray* was not raised by either Winkler or the State either before the District Court or here. Even though the *Murray* decision was handed down in 1988, Winkler never asserted, before the District Court or here, that the officers would not have sought a search warrant but for their improper entry into the garage. Indeed, Winkler's argument here presupposed the opposite. Winkler's attorney conceded the officers had sufficient probable cause for a search warrant before they entered upon his property. During oral argument, Winkler's attorney said:

"If you look at the events that occurred prior to the time they went there, they had found a man laying in the ditch at about 7:00 in the evening. By 8:00 they had gone to the local bars, had talked to two local bars, Stu's Pub and Sammy's Bar, and they had narrowed it down already to one person having left the bars during that 6:00 to 7:00 time period.

\*     \*     \*     \*     \*     \*

"By the time they got there, they had already found evidence of a 1994 truck laying in the roadway near the accident—pieces of the lens from the lights. They knew that my client had driven or left the bars at about that time. They knew he had a 1994 pickup. They knew where he lived. They went right to his house.

\*     \*     \*     \*     \*     \*

"As far as I'm concerned, at the time they went into the garage, *there was sufficient evidence to get a search warrant without even going onto the property.* They knew he had a vehicle. They knew he had been in the area. And they knew his vehicle was a '94 vehicle, which they had." (Emphasis added.)

In *Murray*, the Court of Appeals had said "there was no causal link whatever between the illegal entry and the discovery of the challenged evidence." *Murray*, 487 U.S. at 543, 108 S.Ct. at 2536. But the District Court had made no such finding, and the Supreme Court said "it is the function of the District Court rather than the Court of Appeals to determine the facts." *Murray*. In *Murray*, the District Court had only "found that the agents did not reveal their warrantless entry to the Magistrate, and that they did not include in their application for a warrant any recitation of their observations in the warehouse." *Murray* (internal citations omitted).

Unlike the District Court in *Murray*, however, the District Court in this case, in its Order Denying Defendant's Motions for Suppression, specifically found "that discovery and seizure of the vehicle was inevitable." I believe the District Court's finding would satisfy *Murray*, if *Murray* had been raised in the District Court and here.

I would affirm.